The greater weight of the medical evidence — including Dr. Shull's diagnosis, Dr. Morowitz's neurological studies and Dr. Marchese's operative findings — support the Deputy Commissioner's conclusion that plaintiff's hand and arm malady was an occupational disease, caused or exacerbated by work activity. While plaintiff may have been more susceptible to repetitive motion problems than other persons performing the same job, it is axiomatic that the "employer accepts an employee as he is" for compensation liability purposes. Anderson v. A.M. SmyreManufacturing Co., 54 N.C. App. 337, 341, 283 S.E.2d 433 (1981).
The circumstances of this case invoke the rule, sometimes harsh in application, that the carrier on the risk during the last injurious exposure to the hazards giving rise to an occupational disease is responsible for the whole compensation due. N.C.G.S. § 97-57; Frady v. Groves Thread, 56 N.C. App. 61, 64,286 S.E.2d 844, aff'd, 312 N.C. 316, 321 S.E.2d 835 (1984). Almost by definition, cumulative trauma diseases — more often "relieved" than truly "cured" by treatment — are exacerbated or accelerated by a substantial number of repetitions of the motion that caused them, and the liability shifts when the disease is "augmented . . . to any extent, however slight". Barber v. Babcock Wilcox Const.Co., 101 N.C. App. 564, 565, 400 S.E.2d 735 (1991). After returning to work for the employer, and eventually to the same task, plaintiff's condition not only recurred, but in his judgment, worsened.
The Act provides plaintiff receive interest on the award "from the date of the initial hearing", but the hearing proper actually lasted from the date when the Deputy Commissioner heard the lay witnesses, January 21, 1993, until the record was closed on November 12, 1993. N.C.G.S. §§ 97-86.2 and 97-84. In the past, my practice has been to order interest paid from the date the record closed, because that conforms most logically with a purpose of the statute — to discourage "frivolous appeals" — since defendants' knowledge of the merits of their case is changed at the hearing stage only by the evidence. Suggs v. KellySpringfield, 71 N.C. App. 428, 431, 322 S.E.2d 441 (1984). This purpose was ascribed to the statute prior to the 1987 amendment, when interest ran from "the date of the award", but that amendment appears to have been motivated by practical considerations rather than any change of intent: Note the amendment to N.C.G.S. § 97-84, also during the 1987 Session, requiring the hearing Deputy to render a decision within 180 days of the close of the record. Had the Legislature intended to discourage defense requests for initial hearings in the same manner, it might have run interest from the date of the accident or notice of the accident to the employer.
However, my colleagues at the Commission have almost all read the phase this to mean "the date the hearing begins". This conforms with a common verbal usage of "the hearing" or "a hearing" to refer to the "live" testimony before the Deputy Commissioner. See also, e.g., I.C. Rule 612(2) and (3). In 1987, before the practice of receiving experts' testimony by deposition became as common, the typical hearing lasted only a day. The Legislature probably never truly contemplated this issue. But the fact that this interpretation has been actually applied with some consistency since, and that there has been no amendment or even appellate litigation concerning it, lends legitimacy to it. Deesev. Southern Devices, 306 N.C. 275, 278, 293 S.E.2d 140, rehearingdenied, 306 N.C. 753, 303 S.E.2d 83 (1983); Hewett v. Garrett,274 N.C. 356, 163 S.E.2d 372 (1968). It also further serves the evident purpose of compensating plaintiff for the lost time and use of the award that it is determined he or she should have had. Consequently, and in the interest of economy and consistency, I accede to and will here and henceforth apply this interpretation.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner with the addition of Finding of Fact 12, Conclusion of Law 5, and Award paragraph 4, and modification of Conclusion of Law 4, Award paragraphs 1 and 3, as follows:
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. At the time of the alleged contraction of an occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. Plaintiff's average weekly wage was $304.75, yielding a compensation rate of $203.17. Defendant-employer was self-insured, with American International Adjustment Company as the adjusting agent during the period from July 1, 1990 to July 1, 1991. Continental Loss Adjusting Company was the employer's adjusting agent from July 1, 1991 to July 1, 1992.
4. Plaintiff was out of work during the period from February 16, 1991 until February 26, 1991; from March 23, 1991, until June 3, 1991; and from May 28, 1992 until November 2, 1992.
5. The following exhibits were stipulated into evidence:
a. Industrial Commission Form 22 dated December 19, 1991.
b. Industrial Commission Form 19 dated December 20, 1991.
c. Industrial Commission Form 19 dated November 19, 1991.
d. Industrial Commission Form 22 dated November 3, 1992.
e. Industrial Commission Form 18 dated October 15, 1991.
f. The medical records of Dr. John Bowen.
g. The medical records of Dr. Nancy Morewitz.
h. The medical records of Dr. Mark Marchese.
 i. The medical records of North Carolina Baptist Hospital and Dr. Thomas Wilson.
* * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. At the time of the hearing, the plaintiff was 47 years old. He has a tenth grade education.
2. Plaintiff's prior work experience included sanding and spraying jobs at other furniture manufacturers and wiring lamps for a lamp manufacturer.
3. Plaintiff began working for defendant-employer in 1988 as a spray-gun operator. Plaintiff used both right and left hands to operate the spray gun, which utilized a trigger release activated by one or more fingers. In the spraying process, the spray gun is passed along the furniture in a sweeping motion. The trigger release is depressed at the beginning of each pass and released at the end of each pass of the spray gun across the furniture being spray-painted.
4. On February 13, 1991, plaintiff sought medical treatment for chest and arm pain, anxiety and tingling in his arms. He was hospitalized by Dr. John Bowen from February 16 through February 18, 1991, and was unable to work from February 16 through February 25, 1991. After nerve conduction studies had been done, Dr. Bowen referred plaintiff to Dr. Newell Shull, a general surgeon, who first saw plaintiff on March 22, 1991. Plaintiff had bilateral carpal tunnel syndrome, and underwent surgery for right carpal tunnel release on March 27, 1991, and left carpal tunnel release on April 10, 1991. Plaintiff was released by Dr. Shull to return to his normal job with no work restrictions on May 6, 1991.
5. Following the surgery, plaintiff was treated at North Carolina Baptist Hospital in Winston-Salem for weight loss, sleeping difficulty, burning pain in his left chest, left arm and face. Plaintiff was released to return to work with a restriction of no lifting over 40 pounds on June 3, 1991.
6. Upon his return to work on June 4, 1991, plaintiff was assigned to a job which required him to shovel pieces of wood into a grinder. Plaintiff also did some warehouse work, bagged hardware and wiped tables. On July 1, 1991, he returned to his regular job in the spray room.
7. Plaintiff continued to work in the spray room, but began to experience a recurrence of the symptoms he experienced prior to the carpal tunnel release surgery. As a result of his employment and tasks performed following his return to work on June 4, 1991, the disease processes in his arms recurred or were significantly augmented. He returned to Dr. Shull in February 1992 who referred him to several neurologists for further evaluation of his condition.
8. On June 29, 1992, plaintiff began treatment by Dr. Mark Marchese who confirmed the diagnosis of bilateral carpal tunnel syndrome and bilateral ulnar nerve entrapment. Plaintiff had extensive disease which had been aggravated by returning to the type of repetitive work which had initially caused his symptoms. Dr. Marchese performed a right carpal tunnel release on July 24, 1992; a left carpal tunnel release on September 2, 1992; a left elbow ulnar nerve release on September 21, 1992, and a right elbow ulnar nerve release on March 23, 1993, subsequent to the hearing held in this matter.
9. As of December 1, 1992, plaintiff had a 15 percent permanent functional impairment of his left hand and a 10 percent permanent functional impairment of his right hand.
10. Plaintiff received short-term disability benefits in 1991 and 1992. There is insufficient evidence in the record from which to prove by its greater weight the amounts and dates of benefits or that defendant-employer is entitled to any credit for these payments made to plaintiff.
11. There is insufficient evidence in the record from which to prove by its greater weight that the periods of missed work from February 16, 1991, until February 26, 1991, and from May 6, 1991, through June 3, 1991, were related to the carpal tunnel syndrome.
12. The initial hearing before the Deputy Commissioner began on January 21, 1993, and the claimant is entitled to interest at the judgment rate on compensation not timely paid from and after January 21, 1993. N.C.G.S. § 97-86.2.
* * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSIONS OF LAW
1. Due to the repetitive manner by which plaintiff performed his job of spraying by using a trigger apparatus, by using a constant sweeping motion over furniture to apply varnish and stain, and by moving his arm so that there was increased motion at the elbow in either side, plaintiff sustained an injury which was due to causes and conditions which are characteristic of and peculiar to his particular trade, occupation or employment, but excluding all ordinary diseases of life to which the public is equally exposed outside of that employment. In performing his job duties, plaintiff had a higher risk of developing carpal tunnel syndrome and ulnar nerve entrapment than members of the general public. Plaintiff has thus contracted a compensable occupational disease pursuant to the provisions of the N.C. Gen. Stat. § 97-53 (13).
2. As a result of the occupational disease giving rise to this claim, plaintiff was temporarily totally disabled and entitled to receive compensation at the rate of $203.17 per week for the periods from March 23, 1991 through May 6, 1991; May 28, 1992 until November 2, 1992; and from March 17, 1993 and continuing thereafter until plaintiff returns to work or defendant-employer obtains permission from the Industrial Commission to cease said payments. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to payment of all medical expenses by defendant-employer as a result of his occupational disease for so long as such examinations, evaluations, and treatment may reasonably be required to effect a cure, give relief, or will tend to lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
4. At the time of contraction of the compensable occupational disease and the initial periods of resulting disability and treatment, the adjusting agent for defendant-employer was American International Adjustment Company. Plaintiff was last injuriously exposed to the hazards of the subject occupational disease when defendant Continental Loss Adjusting Co., Inc. was the servicing agent on the risk for the self-insured employer, and that defendant is responsible for all treatment and periods of disability beginning with plaintiff's appointment with Dr. Shull on February 13, 1992.
5. Should the defendant-employer and either adjusting agent decline to appeal this award, or otherwise concede the compensability of plaintiff's condition, they shall pay compensation in accordance with this award, subject to the right to reimbursement if responsibility for the compensation is ultimately found to fall on the other servicing agent and was paid from a different fund. N.C.G.S. § 97-86.1(b).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendant-employer and American International Adjustment Company shall pay plaintiff temporary total disability compensation at the rate of $203.17 per week for the periods from March 23, 1991 through May 6, 1991. The employer and Continental Loss Adjusting Company shall pay temporary total disability benefits for the periods May 28, 1992 until November 2, 1992; and from March 17, 1993 and continuing thereafter until plaintiff returns to work or defendant-employer obtains permission from the Industrial Commission to cease said payments. Amounts which have accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved below.
2. Defendant-employer and its adjusting agents shall pay all medical compensation expenses incurred or to be incurred by plaintiff as a result of the occupational disease, for so long as such examinations, evaluations, and treatments may reasonably be required to effect a cure, give relief, or lessen plaintiff's period of disability, when bills for the same have been submitted through defendant-employer to the Industrial Commission and approved by the Commission. American International Adjusting Company shall pay charges for medical compensation incurred for treatment of the compensable condition prior to February 13, 1992, and Continental Loss Adjusting Company shall pay medical compensation expenses incurred on and after February 13, 1992.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff in Paragraph 1 of this Award is approved for plaintiff's counsel, and twenty-five percent of the lump-sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel.
4. Defendant shall pay interest at the judgment rate from January 21, 1993 on compensation due or coming due, unless paid as accrued. Interest shall be paid directly to plaintiff without deduction for attorney's fees.
5. Defendant-employer and American International Adjustment Company shall pay the costs of this action, including an expert witness fee of $185.00 to Dr. Newell Shull.
 S/ __________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ __________________ COY M. VANCE COMMISSIONER
JRW/tmd 5/12/95